1

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

_____

3

UNITED STATES OF AMERICA

4

                    Plaintiff

5

         vs.          Criminal Action No. 04-53E

6

JONTEE DAMON RUSSELL

7

                    Defendant

8 _____

9

                PROCEEDINGS

10

         Transcript of Sentence commencing on Wednesday,
11   June 22, 2005, United States District Court, Erie,
     Pennsylvania, before Honorable Maurice B. Cohill,
12   District Judge.

13   APPEARANCES:

14   For the Government:        US Attorney's Office
                         By:  Marshall Piccinini, Esq.

15
     For the Defendant:        Anthony Logue, Esq.

16

17                 Reported by:
                   Michael D. Powers, RMR
18                  Official Court Reporter
                   Room 5335 USPO & Courthouse
19                  Pittsburgh, Pennsylvania 15219
                   (412) 208-7572

20

21

22   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
23

24

25


                                   2


1              I N D E X

2   GOVERNMENT WITNESS     DIRECT  CROSS  REDIRECT  RECROSS

3   JASON CROUSE

4     By Mr. Piccinini    3          10
      By Mr. Logue              9
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


3


1        P R O C E E D I N G S

2    (Court convened on Wednesday, June 22, 2005, at 9:00 a.m.

3    in chambers.)

4        THE COURT:  All right.  This is a government motion

5    for a sentencing departure based on substantial assistance to

6    the authorities.

7        And I think it's been stipulated by both sides that

8    this should be held -- it's being conducted on the record.

9    We have a Court Reporter here, but we are in chambers, as

10    opposed to conducting a public hearing on this matter.

11        Is that right, Mr. Piccinini?

12        MR. PICCININI:  That is correct, Your Honor.

13        We anticipate, in support of our motion, to put on

14    testimony concerning the nature of the cooperation actually

15    of a third person, the defendant's co-defendant, Lisa Dacus,

16    had cooperated with authorities on Mr. Russell's behalf.  And

17    rather than disclose the nature of that cooperation publicly,

18    we wanted to do it back here in chambers.  And I brought back

19    here in chambers with me Special Agent Jason Crouse from the

20    FBI.

21        THE COURT:  Mr. Crouse is going to testify?

22        MR. PICCININI:  Yes, he will, Your Honor.

23        THE COURT:  Would you stand and be sworn?

24              * * * * *

25        JASON CROUSE, having first been duly sworn,

Crouse - Direct              4

1    testified as follows:

2        THE COURT:  Would you state your name for the

3    record, please?

4          THE WITNESS:  Jason Crouse.  C-r-o-u-s-e.

5          THE COURT:  Okay, Mr. Piccinini.

6                    DIRECT EXAMINATION

7   BY MR. PICCININI:

8   Q    Special Agent Crouse, how are you employed?

9   A    I'm a Special Agent with the FBI.

10  Q    And how long have you been employed in that capacity?

11  A    Since August, 2002.

12  Q    And are you currently the coordinator of the Erie Area

13  Gang Law Enforcement Federal Safe Streets Task Force?

14  A    I am.

15  Q    And that task force, is its responsibility to

16  investigate violent crime and drug activities in and around

17  the Erie area?

18  A    Yes, it is.

19  Q    Did you become involved in the investigation related to

20  Mr. Russell, defendant here, and his co-defendant, Lisa Marie

21  Dacus?

22  A    Yes.

23  Q    After these two individuals were indicted and brought

24  before the Court, did Miss Dacus, through her attorney, come

25  forward expressing a willingness to cooperate on behalf of

Crouse - Direct          5

1  Mr. Russell?

2  A   Yes, she did.

3  Q   If we can go through for the Judge the things that

4  Miss Dacus has done, And it's a little bit odd that the one

5  co-defendant cooperated on behalf of the second co-defendant.

6  So, if we can explain that a little bit more.

7        Throughout the nature of her cooperation, has

8  Miss Dacus continued to request that any credit for her

9  cooperation be provided to Mr. Russell at his sentencing?

10  A   Yes, she has.

11  Q   Has she done the things that we have requested of her?

12  A   Yes, she has.

13  Q   And do we -- does the FBI -- is the FBI's estimate of

14  that cooperation that it has been substantial?

15  A   Yes, it is.

16  Q   Can you indicate to Judge Cohill what things Miss Dacus

17  has done, first of all, with regard to intelligence

18  information, the providing of information to law enforcement?

19  A   Miss Dacus gave us information regarding co-defendants

20   in this case, as well as her knowledge of their operations in

21   the drug trade.

22        She also provided general drug-related information

23   regarding people living in the Erie area.

24   Q    Now, did she do anything actively with regard to making

25   purchases of controlled substances?


                    Crouse - Direct              6


1   A    Yes, she did.  She conducted a controlled purchase from

2   one individual who had -- then was able to provide us further

3   information and was valuable to an ongoing investigation.

4        She also conducted another purchase from two

5   individuals during the same transaction.

6        Further from that, she provided information to the

7   Pennsylvania State Police regarding the sale of bootleg

8   videos out of Perry Plaza.  However, that information was not

9   able to be used for law enforcement purposes.

10   Q    All right.  With regard to the first controlled purchase

11   that she made as a result -- directly as a result of the

12   controlled buy that she made of crack cocaine, did the person

13   who she made that buy from then engage in further cooperation

14   with law enforcement?

15  A    That individual did further cooperate with us after that

16  buy.

17  Q    And is that information likely to result in federal

18  charges?

19  A    Yes, it is.

20  Q    And in addition to the second series of purchases that

21  she made, although there was no indictment that resulted from

22  it, did it result in the revocation of someone's probation or

23  parole because of what she had done?

24  A    That was not the basis for his revocation.

25  Q    But, the individual who she made the purchase from has

Crouse - Direct                7

1  since been revoked from state probation?

2  A    That's correct.

3  Q    And is now serving a sentence of two to four years?

4  A    That's correct.

5  Q    And then, in addition, she provided information to the

6  Pennsylvania State Police concerning a local store that was

7  selling bootleg videos, is that correct, as well?

8  A    That's correct.

9   Q    That has not resulted in any federal or state charges

10  but is under investigation?

11  A    That's correct.  The State Police actually attempted to

12  use that information and purchase bootleg videos from that

13  store, but were unsuccessful in doing so.

14  Q    Now, in the course of this post-indictment cooperation,

15  has it come to law enforcement's attention, through a named

16  cooperating witness to you and to the defendant, that the

17  defendant was likely hiding a quantity of cash in a safe

18  located in that cooperating witness' uncle's home?

19  A    That's correct.

20  Q    Have we attempted to discover whether this cash, that

21  was proceeds from drug dealing activity, was actually present

22  in that uncle's home?

23  A    Yes, we have.

24  Q    As a result of discussions with Mr. Russell and with

25  Miss Dacus, from the FBI and the State Police and the Eagle

Crouse - Direct            8

1   Task Force's investigation, does it appear that Mr. Russell

2   has actually been candid with us, straight with us and honest

3   with us with regard to that cash and its current whereabouts

4   or its existence in the first place?

5   A    It's my belief he has not been candid with us in any

6   form with regard to that safe or cash.

7   Q    And did we discover whether Mr. Russell and Miss Dacus,

8   through conversations they had over the prison telephone

9   system, actually discussed approaching the cooperating

10  witness and getting him to recant his story about the cash?

11  A    That's correct.

12  Q    And does it appear, in the course of Mr. Russell and

13  Miss Dacus' conversations, that they both are discussing how

14  not to disclose the truth about this $60,000.00 or so in cash

15  that was present in that safe?

16  A    That's correct.

17  Q    All right.  With regard to Miss Dacus and the active

18  things that she did, was she required to wear a body recorder

19  during the course of those controlled purchases?

20  A    Yes, she was.

21  Q    And in common with a controlled purchase of narcotics,

22  is there some danger to the cooperating witness inherent in

23  that because you are dealing with people making a controlled

24  buy and at any minute the FBI could come swooping in and make

25  an arrest?

Crouse - Cross              9

1   A    That's correct, especially with respect to the first buy

2   that she made.

3   Q    And that is because law enforcement swoops in right

4   after the buy?

5   A    That's correct.

6       MR. PICCININI:  That's all.

7       I do have some comments about this, Your Honor,

8   because it is somewhat unique.

9       THE COURT:  Counsel.

10      MR. LOGUE:  Thank you, Judge.  Just a few

11  questions.

12              CROSS-EXAMINATION

13  BY MR. LOGUE:

14  Q    Mr. Russell did provide information to you with respect

15  to other cases or investigations in the state of Michigan,

16  correct?

17  A    Yes.  As part of his cooperation, originally he told us

18  that that's where he was receiving his cocaine.

19  Q    And, in fact, there was some coordination with

20  detectives, I believe, in Flint, Michigan, and the FBI office

21  in Flint with respect to the information that he gave you?

22  A   His brother attempted to go to Flint, Michigan, in an

23  effort to cooperate, but once he got up there, they found him

24  difficult to deal with and he didn't cooperate.

25  Q   But, his brother went at his request?


                    Crouse - Redirect              10


1   A   That's correct.

2   Q   Is that investigation ongoing or was it terminated?

3   A   It terminated as of the day his brother left Flint.

4   Q   And the information, just to touch slightly on the safe,

5   this information was given to you by an additional

6   co-defendant of Mr. Russell, is that correct?

7   A   That's correct.

8       MR. LOGUE:  Nothing further.  Thank you, Judge.

9       THE COURT:  I mean, have you talked directly to

10  Mr. Russell about this and he just says I am not going to

11  tell you, or what's been the attitude with respect to the

12  cash?

13              REDIRECT EXAMINATION

14  BY MR. PICCININI:

15  Q    What was Mr. Russell's response when confronted about

16  the cash that we believe was the proceeds of drug dealing?

17  A    He denied that it existed.

18  Q    And you have reason to believe that it does?

19  A    That's correct, Your Honor, based on the original letter

20  from the co-defendant identifying the existence of the safe.

21       THE COURT:  That is Miss Dacus?

22       MR. PICCININI:  No.  This is Jamar(Sp) Dupree(Sp)

23  Atkinson.(Sp).

24       THE WITNESS:  That's correct.  Based on that

25  letter, we followed up with requests of both Miss Dacus and

                    Crouse - Redirect            11

1  Russell and they denied the presence of that.

2       However, after review of recorded telephone

3  conversations from the Erie County Prison between Miss Dacus

4  and Mr. Russell, it's very clear to us that they were

5  discussing the fact that we were onto the safe, and they were

6  talking in code, and otherwise, how to conceal the safe and

7  that things were okay; very suspicious conversations bringing

8  that out.

9        We had Miss Dacus come in and review the tapes.

10    She listened to the portions of the tapes where we believed

11    that she was discussing the safe with Mr. Russell and she

12    continued to deny the presence of the safe, but could offer

13    no explanation as to what they were talking about or what the

14    codes meant.

15    Q    And in addition to this Jamar Dupree Atkinson, after

16    having Miss Dacus approach law enforcement officers and ask

17    that if Mr. Atkinson changed his mind about where the safe

18    was or whether the safe existed, whether Mr. Russell could

19    still get a 5K, and then after listening to prison

20    conversations where Mr. Russell and Miss Dacus discussed

21    persuading Mr. Atkinson to change his story, did Mr. Atkinson

22    then come back in and change his story and say that he gave

23    inaccurate information about the safe?

24    A    That's correct.

25        THE COURT:  What's the government's attitude about


                    Crouse - Redirect              12


1    this, Mr. Piccinini?

2        I mean, are you just -- are you filing your 5K just

3  because you promised to, at some point along the line

4  subsequent to his guilty plea, maybe before the guilty plea?

5  I don't know.

6          But, what's your attitude now about this?

7          MR. PICCININI:  These are the comments that I

8  wanted to make, Your Honor.

9          The U.S. Attorney has the discretion whether or not

10  to file this motion.  And after looking into the matter, we

11  decided to do so because, in fact, Miss Dacus has done things

12  that we requested and that those things are substantial.

13          However, even though she did those things, and

14  those things were likely to relate in an indictment, we need

15  to be candid with the Court that, you know, in the real

16  knowledge of a cooperating defendant, Mr. Russell has, mostly

17  because he was incarcerated, has done very little when given

18  the opportunity to be candid about what we believed to be

19  drug proceeds, and we don't buy his version that it didn't

20  exist.  He hasn't been candid with us.

21          And for some reason, Miss Dacus is protecting him,

22  as well, which is consistent with her doing all of this

23  knowing that she is going to get sentenced at some point if

24  convicted and she is not going to get any credit for this

25  cooperation.

Crouse - Redirect          13

1       So, I just wanted to make sure it is clear to the

2  Court that we gave Mr. Russell the opportunity to come clean

3  on this.  He chose not to do so.  The U.S. Attorney has

4  exercised her discretion and has still filed a motion with

5  the Court because this woman did, in fact, make controlled

6  purchases.

7       But, when you decide whether to grant the

8  government's motion and whether to depart downward in the

9  guidelines in comparison to other cooperating witnesses who

10  know that when this is on the line, this is the time to be

11  candid with law enforcement, I think you should take that

12  into consideration.

13      THE COURT:  Do you have any statement you would

14  like to make at this point?

15      MR. LOGUE:  Well, Your Honor, obviously I met with

16  Mr. Russell and another member of the Task Force with respect

17  to this matter regarding the safe on two occasions at the

18  County Prison.

19          And on both occasions, we were there for a lengthy

20    period of time and Mr. Russell sure understood the gravity

21    with respect to the 5K motion, and such, on his life and what

22    this can mean and steadfastly said no, this safe did not

23    exist.

24          The information is coming from another co-defendant

25    who obviously, I would commit to the Court, has some type of

                    Crouse - Redirect              14

1    motive here to want to make himself stand better in the eyes

2    of the government and that person is incarcerated so his

3    motive might be to try to make himself look good at the

4    expense of Mr. Russell.

5          Now, certainly they listened to these recorded

6    conversations.  I did not have the opportunity to listen to

7    those.  And it's their view that a safe does exist.

8          I am sure, with the resources that the government

9    has available to them, they could have obtained a search

10    warrant.  They could have done other things also.

11          At this point, it is my understanding, in speaking

12    with my client, there is no safe.  And the information, I

13    think, is tainted and jaded and coming from a co-defendant

14  who is unreliable.

15      THE COURT:  Okay.  Well, let's -- I think I heard

16  all I need to hear.  Let me think about it a little bit and

17  then we will let you know as soon as we come out.

18  (Court recessed in chambers at 9:20 a.m.)

19  (Court reconvened in open court at 9:25 a.m.)

20      THE COURT:  Good morning.  Be seated, please.

21      This is the time set for the sentencing of Jontee

22  Damon Russell.  We note that both Mr. Russell and his

23  attorney have signed the notice indicating they received and

24  reviewed the presentence report.  We'll make the report part

25  of the record under seal.  Of course, if an appeal should be

                    Crouse - Redirect              15

1  taken, counsel will be given access to that report.

2       Neither the government nor the defendant have filed

3  objections to the presentence report.

4       In the wake of the recent decision by the United

5  States Supreme Court in United States against Booker,

6  125 Supreme Court 738 and issued in 2005, the Sentencing

7  Guidelines are now advisory only, but we are still obligated

8    to consult those guidelines in determining imposition of a

9    reasonable sentence.

10        And, therefore, to the extent necessary, we are

11   taking a look at the guidelines and at the same time

12   considering the factors set forth in 18, United States Code,

13   Section 3553(a).

14        There have been no objections filed by either side

15   to the presentence report.  And, thus, we find that initially

16   that the appropriate offense level here is 23.  The criminal

17   history category is Roman numeral IV.  And, thus, the

18   applicable guideline range is seventy to eighty-seven months

19   of imprisonment.  The defendant is ineligible for probation.

20   Supervised release of four to five years, a fine in the range

21   of $10,000 to $2,000,000, and a special assessment of

22   $100.00.

23        Before beginning the public portion of this

24   hearing, at the request of counsel, I met with counsel for

25   Mr. Russell and for the government in chambers along with


                    Crouse - Redirect                16


1    Mr. Russell and took a certain amount of testimony with

2    respect to a 5K motion that the government had filed, and I'm

file:///A|/RUSSELL.TXT

3    considering that with respect to the appropriate sentence to

4    impose here.

5         At this time, Mr. Logue, is there anything you

6    would like to say or introduce any additional testimony on

7    behalf of your client?

8         MR. LOGUE:  Just a brief sentence about the

9    sentencing, Your Honor, and thank you once more.

10        Good morning.  Obviously, you have the presentence

11   investigation report, which you have mentioned.  I think the

12   report would indicate that Mr. Russell is currently age

13   twenty-one; just having turned twenty-one, I believe, back in

14   April of this year.

15        Also, most importantly to the Court, the

16   presentence investigative report indicates a serious drug

17   problem that Mr. Russell has experienced since age twelve.  I

18   believe since age twelve, he has used marijuana, crack,

19   cocaine, and most recent would be the drug ecstasy.

20        And I believe some of the government proof in this

21   case, if there would have been a trial in this matter, the

22   confidential informant, who was wired at the time, was

23   speaking to Mr. Russell with respect to the drug ecstasy and

24  how it has changed him and has taken ahold of him.

25      So, he has experienced a severe drug problem at the

                    Crouse - Redirect            17


1  young age of twelve.  And since he just turned twenty-one,

2  you can see the significant impact drugs have had upon him.

3  He has been a user for the majority of his life.  Obviously,

4  the charges here are different.

5      Also, with respect to -- and the reason I am

6  bringing this up regarding his drug problem is, obviously, he

7  went to tenth grade and the investigative report indicates

8  that there are no job skills that he has.

9      So, he does need rehabilitation.  He does need to

10  obtain education, appropriate vocational skills and, again,

11  to defeat the drug habit that he has.

12      Next week, Your Honor, he is going to be in State

13  Court for revocation charges that he has been detained upon

14  since the indictment has been issued.

15      I submit to the Court that the Judge that will be

16  sentencing, or resentencing him on those charges, is very

17  Draconian in his methods, very strict, and I believe that he

18  will be receiving some form of severe sentence with respect

19  to that matter.

20       Your Honor, I request that any sentence that you do

21  impose upon Mr. Russell include a component of drug

22  rehabilitation that he may receive in the federal system.

23       I know the Court cannot issue this order, but I ask

24  that a recommendation be entered that he stay within the

25  district, preferably at McKean Federal Institution.


                    Crouse - Redirect              18


1        And I just simply ask that, as the Court already

2  noted, the guidelines are advisory in nature.  Obviously

3  presents at a young age with a history of seven -- or excuse

4  me -- of a four category and the Court, again knowing that

5  these are advisory, does have the legal aid to fashion an

6  appropriate sentence for this young man.

7        This young man, again, his life has revolved around

8  drugs, being a user at a young age, and I think that's led

9  him into the current problem.

10       So, I just ask the Court to be lenient in

11  sentencing in this matter.

12       THE COURT:  Thanks, Mr. Logue.  I will be willing

13   to make both those recommendations, McKean, and that he be

14   enrolled in an appropriate drug program.

15          But, as you say, those are only recommendations

16   from the Court, not orders, because we can't order the Bureau

17   of Prisons with respect to this kind of an issue.

18          Mr. Russell, is there anything you wanted to say?

19          MR. RUSSELL:  No, sir.

20          THE COURT:  Mr. Piccinini?

21          MR. PICCININI:  No, Your Honor.

22          THE COURT:  Mr. Logue, is there any reason that

23   sentence should not be imposed at this time?

24          MR. LOGUE:  No, Your Honor.

25          THE COURT:  Mr. Russell?


                    Crouse - Redirect            19


1           MR. RUSSELL:  No, sir.

2           THE COURT:  Mr. Piccinini?

3           MR. PICCININI:  No, Your Honor.

4           THE COURT:  Well, you don't have too much to show

5    for your life since you have gotten involved in drugs,

6    Mr. Russell, and I would say right now you're almost beyond

7    the cross-roads.  Probably the next time you would be

8    arrested, it could very well result in a life sentence.  You

9    got to keep that in mind when do you get out.

10        You have been involved, according to the

11   presentence report, in a couple of drug rehabilitation

12   programs which didn't work.  In prison, you won't have an

13   opportunity to walk away from them.  But, again, you won't

14   get anything out of it if you don't cooperate with those that

15   are trying to work with you.

16        Pursuant to the Sentencing Reform Act of 1984, it

17   is the judgment of the Court that the defendant,

18   Jontee Damon Russell, is hereby committed to the custody of

19   the Bureau of Prisons to be imprisoned for a term of sixty

20   months.

21        Now, if there is further cooperation from

22   Mr. Russell, either with respect to what we talked about in

23   chambers or with respect to any other issues that might come

24   up to help law enforcement, the Court would consider a --

25   what's called a 35(b) motion.  That's after a person has been

                    Crouse - Redirect            20

1    sentenced, the government can come in and recommend a further

2    reduction in sentence, but that has to be within one year of

3    the sentencing.

4         So, if Mr. Russell should cooperate sufficiently

5    with the government within the next year to make the

6    government feel that a 35(b) motion was in order, of course,

7    we would perhaps look upon that favorably as well.

8         Upon release from imprisonment, the defendant shall

9    be placed on supervised release for a term of four years.

10   Within seventy-two hours of release from the custody of the

11   Bureau of Prisons, the defendant shall report in person to

12   the Probation Office in the district to which he is released.

13        While on supervised release, the defendant shall

14   not commit another federal, state or local crime, he shall

15   comply with the standard conditions of supervision that have

16   been recommended by the Sentencing Commission and adopted by

17   this Court.

18        He shall also comply with the following additional

19   conditions:

20        The defendant shall not unlawfully possess a

21   controlled substance.  The defendant shall be prohibited from

22   possessing a firearm or destructive device.  The defendant

23   shall participate in a program of testing and, if necessary,

24  treatment for substance abuse as directed by the Probation

25  Officer until such time as the defendant is released from the


Crouse - Redirect          21


1   program by the Probation Officer.

2           Further, the defendant shall be required to

3   contribute to the costs of services for any such treatment

4   not to exceed -- in an amount determined by the Probation

5   Officer, but not to exceed the actual cost.  The defendant

6   shall submit to one drug urinalysis within fifteen days after

7   being placed on supervision and at least two periodic tests

8   thereafter.

9           The defendant will attend classes for and obtain a

10  General Equivalence Diploma if he is unable to achieve that

11  while in prison.

12          The Court will waive a fine in this case due to the

13  defendant's inability to pay.  It is further ordered that the

14  defendant shall pay to the United States a special assessment

15  in the amount of $100.00 which shall be paid to the U.S.

16  District Court Clerk forthwith.

17          We believe that a sentence of sixty months,

18  followed by four years of supervised release, will adequately

19  address the sentencing objectives of individual and general

20  deterrence and punishment and protection of the community.

21       Mr. Russell, you have a right to appeal.  Any

22  appeal must be filed within ten days.  You are entitled to a

23  lawyer at every stage of the proceedings.  If you cannot

24  afford an attorney, one will be provided for you without

25  charge.


                 Crouse - Redirect              22


1       And I think -- I don't think there are any counts

2  to be dismissed.

3       MR. PICCININI:  There are not, Your Honor.

4       THE COURT:  Court is adjourned.

5  (Court recessed on Wednesday, June 22, 2005, at 9:35 a.m.)

6

7                 * * * * *

8       I certify that the forgoing is a correct transcript

9  from the record of proceedings in the above-entitled matter.

10

11                 S/Michael D. Powers
                   Michael D. Powers
12                 Official Reporter

file:///A|/RUSSELL.TXT

13    *****NOT CERTIFIED WITHOUT ORIGINAL SIGNATURE*****

14

15

16

17

18

19

20

21

22

23

24

25